The last matter before us today is 23-2047, United States v. Pena. Good morning, Your Honors. Kurt May on behalf of Jose Pena. In this appeal, we're questioning what it means to give a statement voluntarily. A person should be able to decide for himself whether to speak. It should be an unconstrained, independent choice, untainted by tactics using inducements and improper influences brought to bear by the police in order to get the person to confess. Here, far from being unremarkable in the aggregate, the tactics used by Pena's interrogator, Rodriguez, were extraordinary. They were intended to undermine his ability to decide for himself whether to speak. And that Pena did not decide for himself to speak but was induced and improperly influenced to do so is best shown by Rodriguez using Pena's wife, Ramirez, to collaborate with him to get him to confess to the sex act with his daughter. The district court made a factual finding that, I'm forgetting her last name, I think it's different. Judge Vasquez. No, Ramirez, was not acting as an agent of the police beyond the point of informing Mr. Pena that, in fact, his daughter had named him as the person in the video. Would you have to show that that finding was clearly erroneous for us to find that she was acting as an agent at that point? Your Honor, I don't believe so. Why not? Well, because, first of all, the court looks at the whole record, and this is a legal issue. The issue is, was the statement made voluntarily? Well, the issue of whether his confession was coerced, I agree with you, is a legal issue that's based on all of the facts and circumstances. But isn't, and that's my question, isn't the factual finding of the role of Ms. Ramirez reviewed by us for whether it's clearly erroneous? Factual findings are, but our position is that this was a legal finding. Or at least a mixed. A mixed finding, if you will. But we certainly believe it was a legal finding. Let me make sure I understand. You believe that the district court's conclusion that Ms. Ramirez was not acting as an agent for the police was a legal conclusion? Yes, Your Honor. Okay. And the reason I say that is because when you look at Colombe, the Supreme Court case, there also a wife was used to get a person to confess. And the court wasn't concerned about agency. That never even came into play in their analysis of what happened. They were simply, they weren't interested in what means she used to coax him or what her motive was. It was simply, did she ask her husband to confess? And that's all that mattered to the court. And so that's why we're saying. But the court, I think more than that mattered to the court in Colombe. I mean, it was a prearranged use of the wife there with the police officer admitting that he asked Mrs. Colombe to help the police and that he wanted to use her as a means of securing her husband's confession. I mean, the testimony of the officer here is directly contrary to that, isn't it? Well, Your Honor, what I would say is that it's pretty clear that he brought her in to collaborate with him. And the reason I say that is he says to Pena, he says, I'm bringing your wife precisely so she can explain to you that this is not a fabrication. I want you to hear it from the mouth of a loved one. Right, that what is not a fabrication? I mean, what the issue is, is that according to the testimony of the officer, which the district court believed, that Mr. Pena would not believe that his daughter had turned him in. And they said they were bringing the wife in for the specific purpose of disabusing him of the notion that his daughter wouldn't have reported him. That's true, Your Honor, but that's not what happened. Because if that was the purpose, she would have been in and out of there in less than a minute. We cited that if the court looks at 242.13 to 243.09, which is on pages 133 to 34 of the transcript, it's clear that that's not what's happening here. Because what happens then is the two of them use shared themes and tandem questioning to get Pena to talk. Do you have any evidence that the wife was involved in a shared theme or a tandem kind of operation to get him to confess? Well, as far as her or Rodriguez saying that, the only thing I can point the court to is a trial. She did say that she was asked to come in to help them. But, however, even if there's no specific evidence, the evidence here shows that the two of them were working together. If you look, for example, Your Honor, at the shared themes, there's four of them. Tell the truth, your daughter's life is at stake, the police need her help, and jail might not be a possibility. If you look at the transcript when she's brought in, when Ramirez is brought in, she and Rodriguez are questioning him in tandem. They're using the same themes. For example, when Ramirez comes in, the first thing she says to him is tell the truth, tell the truth. This is something he'd already heard 37 times from Rodriguez. Well, the first thing she says is she tells him that, in fact, his daughter did report it. Yes, Your Honor, that's correct. Okay. That's correct. And then she then blurts, you know, come on, just tell the truth. Right, and she says your daughter wants to kill herself. That's another theme that was already introduced earlier in the interrogation by Rodriguez. And this is, for our position, this is extremely problematic because here you have somebody, what the purpose of that was, was to get Pena to fear, to believe and to fear that unless he confessed, his daughter's life was at stake. And, again, during this period of time that Ramirez is in there, the two of them, her and Rodriguez, go back and forth talking about the daughter's life being at stake unless he confesses. What do we do with the fact that three separate times the officer said, should we have your wife leave, and Mr. Pena said no, she can stay? Your Honor, at the point that he says your wife can leave and he says no, it's okay, she knows everything, that was the point at which he had already sobbed and began crying. So her effect on him had already passed. She was used by Rodriguez to play on his emotions and get him to admit to sex act. So by the time he said she can leave, it was already done. She had done the work that Rodriguez had brought her in there for. Well, one of the things that the district court relied on in concluding that Ms. Ramirez was not acting as an agent of the police officers was that Ms. Ramirez seemed to have a different view of what his truthful confession would show. That she seemed to still be under the impression that there was this gang that had threatened to kill him and that this was the only way that they would not kill him. And that the police, on the other hand, believed that that was not true. And one of the things the district court relied on is when you look at her comments, she says go ahead and tell them the truth because right now they think it's all on you. They think this is all your fault. Is that a reasonable assessment by the district court? First of all, we don't think it's relevant. And second of all, it's not reasonable. It's not relevant because it's the effect on Pena that matters. Were they playing on his emotions by bringing this up? And I would point out to the court, too, that Rodriguez admitted in his testimony at the suppression hearing that at that point that he brought Ramirez in, he had not gotten Pena to admit that he had had sex with his daughter. And that was the point of bringing Ramirez in. The whole business about the cartel didn't matter to him. As a matter of fact, that's pretty evident, too, because, again, after he goes through and has him admit all the elements of criminal sexual penetration in New Mexico, he then dismisses his wife and then they go into the Jaime Pérez thing. So his point of bringing her in was to play on Pena's emotions, to get him to confess to the sex act. He figured he would take care of the Jaime Pérez thing by himself. Didn't need her there. And there was also an issue about what would happen if he pushed that with her there. How would she react? She was much more useful to him if she was still believing that there was a cartel involved as opposed to having him say, oh, by the way, this was all me. I'm the one who enveigled our daughter to have sex with me. As to harmless error, there is a whole litany. And if you analyze the evidence, you have the cell phone and the Facebook evidence of Pena setting up this scheme. You have his fabrication of being beaten, followed by a denial of that whole thing. You have videos of Pena having sex with a female. You can't identify facially who that is, but the woman is holding a phone that has a unique case that is identical to the one of his daughter's. She has white fingernail polish exactly like his daughter. And his daughter struggles with her testimony, but ultimately says, I believe so, in response to a question of whether she had sex with her father. There was a disclosure of sexual activity with the father to the resource officer at school. She told the nurse that she was forced to have sex with a family member. She was visibly distraught on October 4. She was a very good student before the incident, and she became a dropout. There was male DNA found in her vagina, and Pena's semen on her underwear. Now, why is the error, if any, not harmless in light of the record? Your Honor, there must be proof beyond a reasonable doubt that the verdict given here was surely unattributable to the confession. And that can't be proven here when we consider how damning a confession is. And I would add to that, too, that there were specific elements of the charge defense that the government did not have direct evidence on. Specifically, the first charge is enticement. That came from his statement that he was Jose Pena. Because if this cartel threat was something that could have been a defense, then there's a question about who is enticing her to do this. The same goes to the other charges, too. I don't understand what you just said. I don't understand it either. What I'm saying, Your Honor, is if you take the confession out of the case, right? Well, that ignores the fact that they have all the computer information that points to the fact that they don't need him to confess that he is the one that was enticing his daughter because they have a whole bunch of evidence based on use of the website and where he is and that he is the only one who knows he's at Walmart, I think it is, when she's contacted. And that she's being contacted is like the calls coming from your own house. She's being contacted on a device that's connected to the same internet connection because they're in the same house. But what we're saying, Your Honor, is that this isn't about whether without this confession at a trial he would surely be convicted. The question is, is the verdict here surely unattributable to the confession? And that's not so here. The confession was featured by the government in their opening, in their closing. When we raised the reasonable doubt in our closing, the government pointed that, well, whatever doubt you might have, that's solved by his confession. We're not arguing that the government had no evidence whatsoever. But that's not the question here. The question is, is the verdict surely unattributable to the statement? And it's not. Well, it's whether the verdict resting on the permissible evidence would have been the same in the absence of the coerced confession. Okay, that's true. I mean, we point to Glass. Glass talks about the context in which it came in, how it was used, and how it compares, certainly. But our point in our reply was to point out that, for example, what Your Honor and Judge Murphy pointed out about the electronic evidence, our position was there was doubt about that, that there was these interlocking IP addresses don't tell you who's using what device and when. And so there was some question about that. The same with the DNA. Well, what about the semen in the underwear? I mean, you know, it's hard to refute that. There was semen in the underwear. And how that got there, our theory, or our suggestion to the jury, was that they were sleeping in bed. There could be transference, something like that. But, again, I guess what I'm trying to emphasize here, Your Honor, is that it's not whether he would have been convicted without, whether the evidence shows he would have been convicted without it. It's whether, was the statement attributable to the verdict here? And it was. Confessions are so damning. They're the most probative damning evidence that the government has when it's coming from a person's own mouth that he did all the, committed all the elements of the crime. Understood. But let me just back up in your explanation about semen on the underwear. Was there independent evidence that, other than on the occasion we're talking about, that he was in bed or sleeping with his daughter? Or are you just saying that could have happened? Which way is it? Is there evidence to support that? There was evidence to support that the two of them slept in the same bed whenever she stayed with her father, yes. There was evidence of that. My time is up. Thank you. Thank you. Good morning. May it please the Court. Jamie Roybal on behalf of the United States. The Court is aware of the, I think, unique facts in this case, which is that for more than one year, Mr. Pena pretended to be a teenage boy on Facebook to communicate with his teenage daughter. He convinced her that a Mexican cartel was going to kill their family unless she responded to a very specific threat, which was to have sex with her father and film those videos and send them. They were filmed and they were sent. Mr. Pena ultimately did confess to being behind the fake Facebook account that sexual assault of his daughter was captured in eight videos. After a jury trial, he was convicted of coercion and enticement of a minor. What about on the confession itself, this theory that the defendants put out, that the presence of Ramirez was initially affected by the government? Effectively, that tainted the whole thing after that. It even taints Pena's request that she remain in the room. Yes, Your Honor. Certainly, we're here today because of Mr. Pena's confession. I would say, first off, the question of whether or not Ms. Ramirez was acting at the direction of the police, the way that Mr. Pena has framed that in his brief, we believe that this is a question of fact. Certainly, this Court does review it. Let's just assume that is. The question is whether it's clearly erroneous. They say that it is very clear that she is initially there at the behest of the government. That taints the whole thing, including Pena's subsequent solicitation or subsequent statements that he wants her to remain in the room, even if the suggestion is those other things are okay then. But if she's there at the government's behest, doesn't that taint everything? It does not, Your Honor. What the district court found is that the initial moment that Ms. Ramirez walked into the room to explain to Mr. Pena that his daughter had in fact reported this to the school resource officer, for that sole purpose, she was acting at the direction of the police. And what the district court found is that it does not stand to reason, that was what she put in her order, it does not stand to reason that what came after was at the direction of the police. The district court accepted Sergeant Rodriguez's testimony at the suppression hearing that he brought her in to explain that her daughter had reported it, and that beyond that there was no, I believe the word Mr. Mayer used was coordination between the two. And if you look at her statements, I mean the court has to conduct a de novo review of the voluntariness issue. If you look at her statements, it is clear that she did not believe that asking him to tell the truth would have caused him to get into trouble. And so, you know, things that she said to him like, right now, because right now they want to blame you Jose, they want to blame you for the whole thing, they're going to put you in jail. Those kinds of comments... But this is all before the point of demarcation, everything else is after he requested her to remain in the room. This happens before that. That does happen before that, right. But if the argument is just bringing her in then taints the entire confession, I think that I disagree with that quite strongly, and I think that the record again shows that that's not the purpose, that she did not come into the room to... Unlike the Colombe decision, in the Colombe decision, there was testimony both I think by the wife and the officer that he brought her in And I would also argue that the Colombe decision is very distinguishable from our case because that interrogation took place over the course of I think four nights and five days. He asked for a lawyer multiple times and he didn't get one. There is nothing remarkable about Mr. Pena's confession other than the content, frankly. But this is a confession or an interrogation that took place... Okay. Your position is that the record is clear. Well, it is not a clearly erroneous finding by the district judge that she was brought in to indicate to him that her daughter is so troubled with this. That's my position, yes, Your Honor, and I think that's supported. And then once she does that, that she is no longer the agent of the government? Yes, and I think, again, if the court looks at her statements, which the district court did here, that is supported. So he tells her while she's still in the room, if I tell the whole truth, they're still going to arrest me. And her response to him is, are you sure? Maybe the truth will change. And then, again, I think that Mr. Pena must bear some responsibility for asking her to stay in the room not once but twice. Sergeant Rodriguez asks if he can excuse her and he says, no, she can stay. And Ms. Ramirez herself offers to be removed from the room, and he asks her a second time to stay. And so I don't think that we can say that... There is no case law that we are aware of, either at the Supreme Court level in this circuit or any other circuit, that just the mere presence of a third person in an interview then renders a confession involuntary. Oh, I understand that. I mean, the whole issue here is agency, I think. Yes, and I think we cited this in our brief, and I would point the court to it again today. It's a very different context. It's a drug case, but United States versus Fernandez. And this court held that sharing a common goal does not transform an independent actor into an agent. And so Ms. Ramirez's goal was tell the truth because then they will see that a cartel is threatening our family and that this was the only way that you could save our family. Sergeant Rodriguez's goal may be similar, tell the truth, because he knows that the truth is not that the cartel is actually threatening the family. That does not mean that Ms. Ramirez is acting at the direction of the police. And again, I think this court would have to reject the district court's, if we want to call it a credibility finding or just acceptance of Sergeant Rodriguez's testimony at the suppression hearing, that he did not direct her beyond asking her to come in to explain that the daughter had reported this to the school police. If we did reject that and we concluded that Ms. Ramirez was acting as an agent of the police for the whole time she was in there, would you concede that the confession was coerced? No. And again, it's because the voluntariness analysis has five separate factors, and not a single one of them is determinative. And so the district court, I think, did a pretty thorough analysis of each of those five factors, and she determined that under the totality of the circumstances, the confession was voluntary. So again, if this court takes a de novo look at that, we would have to look at Mr. Pena's age. He was an adult male. He was, I think, close to 40 years old at the time. This was an interview that lasted, I believe it was three hours and 45 minutes, so close to four hours. I think just looking at all five factors, again, the nature of the questioning, Sergeant Rodriguez wasn't doing anything remarkable. And the district court made a number of factual findings that were not favorable to Sergeant Rodriguez. The district court judge did not approve of his tone, for example. But she also noted there is no civility requirement when we're talking about an interrogation setting. Well, he was doing more than being uncivil. He was yelling. He was shoving his finger in his face. He was getting up in his space, all things that are intimidating, right? I would agree, partially at least, with that judge. Of course, you don't have any audio recording of the suppression hearing, but he is quite loud. It's something that he was quite loud at the suppression hearing as well. When you gave him a microphone, he was even much louder than that as well. And she found that his tone was quite skeptical of Mr. Pena. He told him from the outset, you know, I don't believe you for one second. There certainly were issues, I think, the district court had with the manner in which he conducted the interrogation. I mean, that could pick your way, though, too, right? Because part of the allegation is that they were trying to convince him that he wouldn't be in trouble. But at the same time, the officer is telling him, I don't believe you from the very beginning. He's suggesting to him that he thinks he's guilty. Yes, Your Honor. I do think that the record shows that Sergeant Rodriguez told him from the outset, you know, that what happened here was a problem. He didn't believe him. And I would also like to point out, I think it's certainly relevant to the court's review. At no point did Mr. Pena ever ask to speak to an attorney. At no point did Mr. Pena ever say, I want to invoke my right to remain silent. Quite the opposite, Mr. Pena confirmed six separate times in the interview that he understood his rights, and he continued to talk with Sergeant Rodriguez. Let me ask you about the interrogator saying, if you don't confess, your daughter's going to kill herself. Your daughter and your son might kill themselves. What about that? Is that over the line? No, Your Honor. Both children had reported suicidal ideations at that point. The daughter was quite distressed, as you may imagine she would be. Well, the truth doesn't make it less compelling. I would point the court to— And he said, you know, if your daughter kills herself, that will be on you. That will be your fault. And I think that when Ms. Ramirez came into the room, she also told him, your children are suffering and your daughter wants to kill herself. And so I would point the court to the Supreme Court case, which— Again, the fact that it's true doesn't change the analysis of whether it weighs in favor of finding that it was coerced. Well, what I would say, Your Honor, is I would point the court to the Supreme Court's decision, the Tompkins decision that we cited in our brief. And the Supreme Court said in that case, quote, the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion. And so I think had—I'll use a hypothetical. Had Sergeant Rodriguez made that up on his own? Had the daughter not reported that she was going to commit suicide? I think had Sergeant Rodriguez just made that up and told Mr. Pena that, that would be a different issue. So you're saying what we're suggesting is incorrect. Is it anything that's truthful, whether compelling a confession or not, is fair game? I don't think that that's—that the children wanted to commit suicide as a result of the situation that was created by Mr. Pena, that that was brought to his attention, that that can be considered official coercion attributable to Sergeant Rodriguez. Kind of the similar is with the Catholic religion comments, right? And this—I would point the court to the same case. In that case at the Supreme Court, the defendant stayed nearly silent for three hours, you know, once in a while saying yes or no. And then the questioning officer asked him if he believed in God. He started crying, and he said yes, and he said, do you ask God to forgive you for killing those victims? And then he said yes, and the Supreme Court found that that was not unduly coercive. So I think, you know, again, in this case, that he was confronted with facts that were true does not make the confession involuntary. Have you exhausted your analysis of the totality of the circumstances in the five factors? What do you mean, Judge? Do you think you've covered it all? Oh, for here today? Well, I see my time is going quickly, so I would like to address the harmlessness question. But did you pretty much cover all the— Pretty much, Judge. I will say, just in closing on this topic, I don't think that any of the cases that Mr. Pena cited are at all comparable to the facts that we have in this record. And so I will move on to address the harmlessness question. Should the court, you know, disagree with us and find that the confession was admitted in error, it is our position that that error was harmless beyond a reasonable doubt. We recognize that that is a very high standard, and I think in this case we can meet this. We feel confident we can meet it. A review of the trial record— And what—I mean, how—what is the test for us? Is it—I think the defense's position is that we would have to conclude that the jury didn't rely at all on the confession to convict him. Would you agree that that's the standard? My understanding of the standard is, would the jury have convicted him absent the confession? And I'll do my best to summarize our evidence in 10 seconds. We had very compelling computer evidence showing that his IP address was the same IP address that was being used— Well, just short—did I pretty much cover everything when I listed all those items? Are there things I missed? You did cover most of it, Judge. What I would—may I finish my answer? Well, I think she probably did, so we'll give you more time. Yeah, that's fine. Okay, thank you. I would point the Court to one specific message that, quote, Jaime Perez sent Jane Doe, which was, quote, it doesn't look like you're enjoying it. Don't be crying. I want for you to be enjoying it. And all of the videos that we presented to the jury did not show her face. This is something that I really emphasized at closing. The only way he knew that she was crying, which is something that she reported to the SANE examiner as well, is because he was in the room with her. So that's one thing. I think the DNA evidence was very compelling. I think the nature of the Facebook threat, that it was only that sex with her father would cure this issue, I think that's about it, Judge. You know, on the ultimate question of would the jury have convicted without the confession, isn't that problematic in light of the government's closing? They said that even if there was doubt about the other evidence, that conviction could be based solely on the confession. I don't recall saying it could be based solely on the confession. You know, what I recall is there's quite a lot, but here's a list of all of the other evidence, but also you do have his confession. We admit that we used it. It was compelling evidence, but I disagree with the notion that we presented with the jury either in opening or in closing or throughout the evidence presented at trial that it was the only thing that they could rely on. And then if I could just add one more thing. You're two minutes over. Oh, thank you, Judge. Thank you. And I'm going to give you two minutes because she ran two minutes over. Did he go over? Oh, two minutes, so we're even. Sorry. That's why. Psych. We will take this matter under advisement and the court will be adjourned. Thank you.